Aaron L. MORRIS, Appellant,

v.

UNITED STATES, Appellee.

No. 96–CF–610.

District of Columbia Court of Appeals.

Argued Feb. 12, 1998.
Decided May 6, 1999.

David A. Singleton, Public Defender Service, with whom James Klein and Jaclyn S.

Frankfurt, Public Defender Service, were on the brief, for appellant.

Simone E. Ross, Assistant United States Attorney, with whom Mary Lou Leary, United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, and Robert S. Mueller III, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and SCHWELB, Associate Judges, and BELSON, Senior Judge.

SCHWELB, Associate Judge:

Aaron L. Morris was convicted by a jury of involuntary manslaughter[1] in connection with the death, on or about February 3, 1995, of three-year-old Rhonda Morris. On appeal, Morris contends that the trial judge committed reversible error by denying Morris' motion to suppress

1. an inculpatory statement made by Morris prior to being advised of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966); and

2. a videotaped confession which Morris made after he had invoked his right to counsel.

Morris further claims that his trial testimony, which was also inculpatory, was induced by the allegedly erroneous admission of his videotaped confession and of the statement that preceded it.

The trial judge gave full and thoughtful consideration to the issues raised in Morris' motion to suppress. The judge found that

Morris was not in custody at the time he made his initial inculpatory statement, and that no *Miranda* warning was required. The judge further found that after declining to answer questions without an attorney, Morris voluntarily re-initiated discussions with the police and intentionally waived his right to counsel. We conclude that these findings are supported by the evidence, and we discern no error of law. Accordingly, we affirm Morris' manslaughter conviction.[2]

## I.

## THE EVIDENCE

### A. *The initial investigation.*

The evidence at the hearing on Morris' motion to suppress statements revealed that on the night that Rhonda Morris died, her mother[3] had left Rhonda, as well as the mother's three other small children, in Aaron Morris' care while she went in and out of her apartment with various men. At about 7:45 a.m. on February 4, 1995, the police received a report of an unconscious child. Officers proceeded to Rhonda's mother's apartment, which was in unsanitary condition,[4] and found paramedics "working on" Rhonda. The little girl was not breathing, and she had no pulse. Rhonda's mother was screaming that "he killed my baby."

The officers discovered Morris with the mother's three other children. Morris told them that he had heard Rhonda crying in the bedroom, and that on checking on her, he had found that she was choking. After he

---

1. D.C.Code § 22-2405 (1996). The jury also found Morris guilty of cruelty to a minor child, in violation of D.C.Code § 22-901. Morris claims that under the judge's instructions and the misdemeanor-manslaughter doctrine, the cruelty conviction may have been the predicate offense for the manslaughter conviction, and that the former therefore merges into the latter. *See, e.g., Bonhart v. United States,* 691 A.2d 160, 164 (D.C. 1997) (defendant could not be sentenced both for felony murder and for the underlying felony of arson). Although each of the offenses of cruelty to a minor child and manslaughter contains an element which the other does not, so that merger would not ordinarily occur, *see United States v. Thomas,* 148 U.S.App.D.C. 148, 154, 459 F.2d 1172, 1178 (1972), the government concedes that in the particular circumstances here presented, Morris' position is correct. We agree, and there-

fore conclude that Morris' conviction for cruelty to a minor child must be vacated.

2. Because the motion to suppress was properly denied, we do not reach Morris' claim that his trial testimony must be stricken as the fruit of constitutional violations by the police.

3. Rhonda's mother, Valerie Morris, is Aaron L. Morris' cousin.

4. Detective Cosby Washington testified that "the living room window was broken.... The place was dirty, foul-smelling. The kitchen was filthy. No, no food, not enough food for the children.... [T]he place was full of roaches, I mean, [they were] jumping off the walls, practically."

was unable to revive the child, he asked a neighbor to call 911. Morris denied that he had killed Rhonda and professed not to know why the mother was claiming that he had. The officers also questioned Morris about whether any of the mother's male associates had contact with Rhonda.

As the investigation proceeded, additional officers arrived and questioned Morris further. Morris told them that he sometimes disciplined the children with a belt, but denied that he had spanked Rhonda that night. The officers took custody of Morris' belt.

While the police were questioning Morris, they learned from Sergeant Evelyn Randall of the Homicide Division that Rhonda had died and that the case was being treated as a homicide. Sergeant Randall requested the officers to bring any witnesses to police headquarters. Detective Jeffrey Owens then asked Morris "if he would mind coming down to the police station to give a formal statement." Morris replied, "Sure." Indeed, according to Owens, Morris appeared to have "no problem" with Owens' request.

At about 10 a.m. on February 4, Detective Owens drove Morris to police headquarters. Morris was not handcuffed or otherwise restrained, and he rode in the passenger seat of Owens' vehicle. Upon arrival at their destination, Detective Owens placed Morris, still unrestrained, in an unlocked interview room. According to Owens, Morris was not then under arrest.

### B. *Morris' first inculpatory statement.*

At approximately noon, Sergeant Randall came in to the interview room and introduced herself. Sergeant Randall told Morris that Rhonda had died, that the little girl had suffered "trauma to the stomach," and that she appeared to have been burned and sexually molested.[5] Sergeant Randall asked Morris what he knew about the injuries that Rhonda had suffered. Morris initially repeated the account that he had given at

Rhonda's mother's apartment, namely, that Rhonda had been choking, that he had tried to help her, and that he had requested a neighbor to call 911.

While the interview was proceeding, Detective Willie Jefferson of the Homicide Division entered the room and joined in the questioning. Jefferson repeatedly contradicted various statements made by Morris,[6] and he confronted him in an accusatory manner.[7] Ultimately, Morris admitted that Rhonda had been crying and that he had punched her in the stomach.

As soon as Morris made this admission, Sergeant Randall stopped the interview and advised Morris of his *Miranda* rights. Morris stated that he understood his rights and that he did not want to answer any questions without a lawyer. At 2:35 p.m., Morris so indicated on a PD–47 "advice of rights" card. Sergeant Randall and Detective Jefferson then left the room.

### C. *The videotaped confession.*

After the interrogation of Morris had been discontinued following his refusal to answer questions without an attorney, Detective Daniel Whalen went into the interview room to obtain non-substantive processing information from Morris. Whalen testified that Morris then asked Whalen if he (Morris) could speak to Sergeant Randall.

Sergeant Randall returned to the interview room, and Morris indicated that he wanted to talk to her. Sergeant Randall responded that she could not discuss his case, and Morris asked her why. In response to Morris' inquiry, Sergeant Randall explained that Morris had "indicated he didn't want to answer any further questions without a lawyer" and that "I had to abide by that." Morris said "OK." Sergeant Randall then called in Detective Jefferson, explaining to Jefferson

---

5. Sergeant Randall had previously examined Rhonda's body at D.C. General Hospital, and she had conferred there with the medical examiner.

6. E.g., when Morris claimed that Rhonda had "messed her pants" and that he had bathed her,

Jefferson insisted that the child was dirty and had not been washed.

7. Detective Jefferson told Morris, for example, that someone had burned Rhonda with cigarettes. Jefferson then asked Morris if he smoked.

that Morris "wanted to tell us about his life." [8]

Morris began to talk about his family background,[9] and he mentioned that he had lived somewhat unhappily with his grandfather in North Carolina. Detective Jefferson, suspecting that the grandfather may have molested Morris, suddenly asked Morris if his penis was dripping, and accused him of having gonorrhea and passing on the disease to Rhonda. Morris denied the allegation. Jefferson also asked Morris if Morris had ever been in prison, and he observed that Morris was "light in the pants."

Morris continued to discuss his family situation and, in particular, his relationship with Rhonda and with her siblings. Remarking that Rhonda was a nice little girl, Morris stated that "I might as well tell you what happened to Rhonda." [10] Sergeant Randall explained that if that was what Morris wanted to do, he would first have to complete another advice-of-rights card and agree to answer questions without a lawyer. Morris agreed to do so.

In the videotaped interview that followed,[11] Detective Jefferson re-advised Morris of his *Miranda* rights, and Morris signed a new Form PD–47 waiving those rights. Morris then stated that Rhonda had "used the bathroom on herself," and that he had "put her in the tub with the hot water and it pulled the skin off her feet." Morris acknowledged that he had grabbed and squeezed the little girl's neck as he pulled her out of the tub and that he had punched her in the stomach. Morris

denied having sexually molested Rhonda, and he explained that he had been "stressed out" and that he was sorry for what he had done.

### D. Proceedings in the trial court.

Following his confession, Morris was indicted on charges of first degree murder, indecent liberties with a minor child, and cruelty to a minor child. The defense filed a pretrial motion to suppress statements which, as we have noted, the trial judge denied.

The government dismissed the indecent liberties charge before trial. At the trial, after the prosecution proved the facts described above, Morris testified in his own defense. Morris reiterated that he had punched Rhonda,[12] but emphasized that he had attempted to resuscitate her, that he had not wanted her to die, and that he was sorry for what he had done.

The jurors apparently credited Morris' testimony regarding his intent, for Morris was acquitted of the murder charge. He was, however, convicted of the lesser included offense of involuntary manslaughter and of cruelty to a minor child. This appeal followed.

## II.

## LEGAL DISCUSSION

### A. The standard of review.

Morris contended in his pretrial motion to suppress, and continues to maintain in this

---

8. Sergeant Randall "guessed" that Morris was "kind of lonely or something" and wanted some company. She testified that "I really didn't think he wanted to talk about the case when he asked me to come back there." See also Part II C(1), *infra*.

9. When Morris mentioned that he had been in trouble over a stolen car, Sergeant Randall interrupted to tell Morris that she did not want to hear about that.

10. The record is unclear as to the precise nature of the discussion that immediately preceded this statement by Morris. The police did not tape-record the conversation that preceded the videotaping of Morris' confession.

11. Detective Jefferson told Morris that if he agreed to give a videotaped statement (as opposed to a written one) "the judge and everybody

else can see your remorse and see that you're telling the truth and look at you when you're telling it."

12. The following passage from Morris' trial testimony does not make pleasant reading, but starkly describes how Rhonda lost her life:

> She was at the back of the tub, with the hot water on her foot. And I went in there, grabbed her by the neck, picked her up out of the tub, dropped her on the floor. Then she was crying and screaming, so I pushed my hand over her mouth real hard, to stop her from screaming. That's when [I] punched her in the stomach ... punched her a few times, punched her hard, picked her up by her neck, pushed her back ... toward the hallway.

court, that the police unlawfully elicited his first inculpatory statement—namely, that he had punched Rhonda—through custodial interrogation conducted by the officers before Morris was advised of his rights pursuant to *Miranda.* Morris also claims that his videotaped confession was improperly obtained by the police by questioning him after he had invoked his right to counsel, and that the judge's refusal to suppress that confession was contrary to the Supreme Court's decision in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Before addressing these contentions, we turn first to the standard of review.

This is a case in which the trial judge made especially detailed and extensive factual findings relevant to the disposition of Morris' motion. The judge's findings were predicated in substantial part on his observation of the witnesses and on his first-hand assessment of the credibility and intent of the various actors in the drama. The judge had a front-row seat as the testimony unfolded. We, on the other hand, are limited to a paper transcript which, while capturing the words of a case, may often miss its heart and soul. *Cf. In re S.G.,* 581 A.2d 771, 774–75 (D.C. 1990). Indeed, as Judge Jerome Frank has recognized,

> [a] stenographic transcript correct in every detail fails to reproduce tones of voice and hesitations of speech that often make a sentence mean the reverse of what the words signify. The best and most accurate record is like a dehydrated peach; it has neither the substance nor the flavor of the fruit before it was dried.

*Broadcast Music Inc. v. Havana Madrid Restaurant Corp.,* 175 F.2d 77, 80 (2d Cir. 1949) (quoting ULMAN, THE JUDGE TAKES THE STAND 267 (1933)).

 The applicable standard of review reflects these realities. On appeal from the trial court's denial of a motion to suppress a confession on *Miranda* (and *Edwards* ) grounds, "our role is to ensure that the trial court had a substantial basis for concluding that no constitutional violation occurred." *McIntyre v. United States,* 634 A.2d 940, 943

(D.C.1993) (citations omitted). The trial court's legal conclusions regarding whether the defendant was in custody and whether the facts, as found by the trial judge, established an *Edwards* violation, are reviewed *de novo. See, e .g., Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Reid v. United States,* 581 A.2d 359, 363 (D.C.1990). Indeed, our overall scrutiny must reflect the reality that we are dealing here with alleged violations of Morris' constitutional rights. *See, e.g., Griffin v. United States,* 618 A.2d 114, 118 (D.C.1992).

The trial court's underlying factual findings, however, are reviewed under the "clearly erroneous" standard, and they will only be set aside if they lack substantial support in the record. *See, e.g., Hawkins v. United States,* 461 A.2d 1025, 1030 n. 6 (D.C.1983), *cert. denied,* 464 U.S. 1052, 104 S.Ct. 734, 79 L.Ed.2d 193 (1984) (finding as to whether officer's comment was custodial interrogation); *Rogers v. United States,* 483 A.2d 277, 283 (D.C.1984), *cert. denied,* 469 U.S. 1227, 105 S.Ct. 1223, 84 L.Ed.2d 363 (1985) (decision as to the validity of a waiver). Finally, we view the record in the light most favorable to the party that prevailed in the trial court—here, the United States—and we must sustain any reasonable inference that the trial judge has drawn from the evidence. *See, e.g., Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc).

### B. *Morris' first inculpatory statement.*

The judge found that Morris was not in police custody at the time he disclosed, during his first interview at the police station, that he had punched Rhonda in the stomach. The judge based this decision on a number of different factors in the record. First, the government conceded, and the judge found, that the police lacked probable cause to arrest Morris at the time he voluntarily accompanied them to the police station "because they didn't know what the underlying predicate was for the mother's accusation against him." [13] The judge pointed out that Morris rode to the police station unrestrained in the

---

13. According to Detective Jefferson, the police originally suspected that one of the mother's boyfriends may have been involved in the offense.

front seat of Detective Owens' vehicle—hardly the conventional means of transporting an individual under arrest for murder. The judge also noted that Morris was not handcuffed during the interview in the interrogation room. As the judge viewed the record, there was no evidence, notwithstanding the prolonged questioning, that Morris was badgered or threatened or that any trickery was used. The judge then stated:

> I think, yes, the police were pressing to try and find out information. Obviously, they thought, I'm sure, that the defendant had something to contribute in reference to what had happened to this child since based upon what they knew he was the person who was in control of the children when the injury occurred.

> I'm sure they weren't desirous of him leaving, but the testimony was that if he had pressed to leave or had been adamant about leaving that they felt that they would have had no alternative other than to let him go.[14]

> So, based upon the testimony that's presented I would have to conclude that up to that point there was no custody for the purposes of *Miranda* in that it was only after he made a statement to the effect that he had punched the child in the stomach that the police then decided to arrest him, and I would conclude that it was after he made that statement that there was in fact custody.

> He was at that point fully advised of his rights....

14. Sergeant Randall testified that, because she lacked probable cause to arrest Morris before he admitted having punched Rhonda in the stomach, she "probably would have let him go" if he had insisted upon leaving.

15. We noted in *Patton* that earlier decisions of this court equating the two concepts had been superseded by binding Supreme Court authority. *Id.*

16. "Generally, an arrest is effected when the police have made a determination to charge the suspect with a criminal offense and custody is maintained to permit the arrestee to be formally charged and brought before the court." *In re M.E.B.*, 638 A.2d 1123, 1126 (D.C.1993), *cert. denied*, 513 U.S. 883, 115 S.Ct. 221, 130 L.Ed.2d

 We perceive no error, factual or legal, in the judge's analysis. Morris asserts that a reasonable person would not have felt free to leave once Detective Jefferson had accused and confronted him, but the trial judge expressly credited Sergeant Randall's testimony that, if pressed, the police would have felt obliged to release Morris. Moreover, even if we were to assume, notwithstanding the judge's finding, that a Fourth Amendment "seizure" had occurred and that Morris was not free to leave, that hypothetical state of affairs would not render the interrogation "custodial."

 Seizure and custody are not synonymous. *Patton v. United States*, 633 A.2d 800, 815 n. 7 (D.C.1993) (per curiam).[15] On the contrary, interrogation is custodial, and *Miranda* warnings are required, "only in those cases in which there has been a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *In re E.A.H.*, 612 A.2d 836, 838 (D.C.1992) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam)) (internal quotations omitted). Even if he had been seized, Morris "was not in custody to the degree associated with formal arrest." *McIlwain v. United States*, 568 A.2d 470, 473 (D.C.1989) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).[16] At the very least, the trial judge could reasonably so find.[17]

Morris relies on *United States v. Gayden*, 492 A.2d 868 (D.C.1985), but that decision, carefully analyzed, does not support his posi-

148 (1994). Obviously, no determination to charge Morris had been made prior to his admission that he had punched Rhonda.

17. Morris also appears to claim that Jefferson's accusatory questioning of him converted his initially voluntary presence at the police station into police detention, and thus into an unreasonable seizure in violation of the Fourth Amendment. Even if we were to assume that Jefferson's conduct effected a seizure, there was certainly no arrest prior to Morris' admission that he had punched Rhonda. See note 16, *supra*. We are satisfied that the mother's accusations against Morris at the apartment provided ample articulable suspicion to support a lesser form of detention. *See, e.g., Gomez v. United States*, 597 A.2d 884, 888–89 (D.C.1991).

tion. In *Gayden,* the defendant was questioned by the police in a hostile and confrontational manner for more than five hours without being advised of his *Miranda* rights. During that time, he made three statements. The trial judge found that the defendant was in custody when he made the third statement. Specifically, the judge stated in his written opinion that, by then, "the confrontation [was not only] sharply accusatory in character, but it was also done in such a manner as to imply that Gayden's situation had changed so significantly that he was no longer free to go." *Id.* at 873 (quoting trial court's Memorandum Order). Invoking the standard of review that we have described in Part II A, above, this court affirmed:

> Giving deference to the court's finding of fact as to the circumstances surrounding Gayden's encounter with the police, (citation omitted), we hold that Gayden must have understood he was under arrest when Sgt. Daly confronted him.

*Id.* at 874 (emphasis added).

In *Gayden,* as in this case, the trial judge's opportunity to assess the encounter first hand was obviously superior to that of the appellate court. In this case, as in *Gayden,* we are in no position to second-guess the trial judge's findings.[18]

### C. *The videotaped confession.*

■ The Supreme Court held in *Miranda* that if an accused who is subject to custodial interrogation expresses his desire to deal with the police only through counsel, "the interrogation must cease until an attorney is present." 384 U.S. at 474, 86 S.Ct. 1602. In *Edwards v. Arizona, supra,* the Court expanded upon this limit on interrogation and declared that police questioning of a suspect who has invoked the right to counsel is prohibited "unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 485, 101 S.Ct. 1880. The Court went on to state that if an accused does initiate communication with the authorities after he has refused

to answer questions without counsel, the police nevertheless may not interrogate him without an attorney being present unless he has knowingly and intelligently waived his right to counsel. *See id.* at 486 n. 9, 101 S.Ct. 1880; *Oregon v. Bradshaw,* 462 U.S. 1039, 1046, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (defining waiver). The "initiation" and "waiver" inquiries are separate, and "clarity of application is not gained by melding them together." *Bradshaw, supra,* 462 U.S. at 1045, 103 S.Ct. 2830 (plurality opinion).

■ In the present case, we entertain no doubt that Morris was questioned by the police after he had declined to answer questions without an attorney. The trial judge found, and we agree, that Morris was being subjected to the substantial equivalent of police interrogation[19] when Detective Jefferson accused him of sexually molesting Rhonda. In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court held that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682 (footnotes omitted). At the hearing on Morris' motion to suppress, Detective Jefferson, who testified as a defense witness, acknowledged that he had decided to accuse Morris of sexually molesting Rhonda in order to see "what kind of reaction I [would] get." Obviously, Jefferson was seeking to elicit a potentially incriminating response.

Morris contends that this questioning was in violation of his right to counsel, and that the judge was therefore obliged to suppress the videotaped confession. Morris claims that he did not "initiate" conversations with the police as that term was used in *Edwards,* and that he did not make a knowing and

---

18. *Gayden* cannot fairly be read as holding that the conviction would have been reversed even if the judge in that case had made findings similar to those made by the trial judge here.

19. *See Stewart v. United States,* 668 A.2d 857, 863 (D.C.1995) (whether actions by police constitute "interrogation" is a question which we review *de novo* ).

intelligent waiver of his right to counsel before interrogation resumed. We address these contentions in turn.

### (1) *Initiation by the accused.*

Writing for a plurality of the Court in *Bradshaw,* Justice Rehnquist wrote that a suspect may be deemed to have "initiated" a conversation with the police, for purposes of the *Edwards* inquiry, if he has "evinced a willingness and a desire for a general discussion about the investigation." 462 U.S. at 1045–46, 103 S.Ct. 2830. The plurality recognized that "[t]here are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation ... [and] will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards." Id.* at 1045, 103 S.Ct. 2830. But because even the broaching of a subject relating "indirectly" to the case against the suspect is sufficient, *id.,* the courts have tended to find that the "initiation" prong (as distinguished from the waiver requirement) has been satisfied even in cases in which any link between the accused's comment or question and the underlying investigation is less than clear. *See, e.g., Bradshaw, supra,* 462 U.S. at 1045, 103 S.Ct. 2830 ("Well, what is going to happen now?" constituted initiation); *Grimm v. State,* 556 N.E.2d 1327 (Ind.1990) (suspect's request to speak with investigator qualified as "initiation" under *Edwards* ); *accord, People v. Bradford,* 15 Cal.4th 1229, 65 Cal.Rptr.2d 145, 939 P.2d 259, 304 (1997) ("What's going on?", combined with a willingness to speak with detectives); *United States v. Grant,* 549 F.2d 942, 945 (4th Cir.1977) ("What happens to me now? Where do I go?"), *vacated and remanded on unrelated grounds, Whitehead v. United States,* 435 U.S. 912, 98 S.Ct. 1463, 55 L.Ed.2d 502 (1978); *United States v. Velasquez,* 885 F.2d 1076, 1079 (3d Cir.1989), *cert. denied,* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990) (request to speak to investigator, combined with question as to what was going to happen next); *but see Jackson v. United States,* 404 A.2d 911, 916, 920–25 (D.C.1979)

(a "'long, rambling, partially incoherent monologue" by mentally impaired defendant did not permit officers to question him after he had declined to answer questions without an attorney).

In the present case, the trial judge unequivocally found that it was Morris, and not the police, who initiated the conversation which led to Morris' videotaped confession:

> And in the context of this case what we have is [Sergeant] Randall coming in and asking him what did he want and the defendant saying he wanted to talk to her. I think clearly her asking what he wanted, after being told by [Detective] Whalen that the defendant wanted to talk to her, was not an initiation of discussions by the [Sergeant] but it was an initiation in response to her request as to what he wanted, an initiation on his part to reinstitute discussions with her. So, I think the first prong of the *Edwards* requirement is in fact satisfied.

The judge's finding surely comports with common sense. Prior to his arrival at the police station, Morris had never met Sergeant Randall. During his first interview with her, their discussion was about the circumstances of Rhonda's death. The trial judge could properly find it counter-intuitive, to say the least, to suppose that when Morris asked that Detective Randall come and see him, he wanted to speak with her about a completely different subject.

Moreover, the first person to whom Morris communicated his wish to speak to Sergeant Randall was Detective Whalen. If Morris had simply wanted to make a routine request (*e.g.,* for a drink of water or for use of a telephone), *cf. Bradshaw, supra,* 462 U.S. at 1045, 103 S.Ct. 2830, he could have asked Whalen to accommodate him. Instead, he specifically requested to speak to Sergeant Randall, the individual who had been in charge of the questioning about his case.

When Sergeant Randall came in to see him, Morris continued to act as though his request to speak to her related to the same subject that they had discussed earlier, namely, his role in Rhonda's death. The reader will recall that, at the beginning of

this conversation, Sergeant Randall told Morris that they could not discuss his case. If it had been Morris' intention to talk exclusively about matters other than his case, then one might have expected him to say so, e.g.: "Of course, Sergeant Randall; I just told you I would not answer any questions about the case without a lawyer. I just want someone to talk to." Instead, Morris asked "why" the two of them could not talk about his case—an odd question indeed if he had no interest in doing so.

 Morris takes issue with the judge's assessment of the facts with respect to the initiation prong. He claims primarily that the judge failed adequately to consider Sergeant Randall's perception of Morris' state of mind: "I really didn't think he wanted to talk about the case when he asked me to come back there." [20] But the judge was well aware of Sergeant Randall's opinion, questioned her about it, and explicitly included it in his calculus:

> And she says in her own mind that she thought when he said he wanted to talk that he was only talking about wanting to talk about his life. Well, I mean, while, obviously, I have to give consideration to what was in her mind, *obviously, that's not determinative as to whether or not that was the only reason he was making those statements.*

(Emphasis added.) We agree with the trial judge's analysis in this respect. The judge's finding that Morris initiated the discussion that led to his videotaped confession was not clearly erroneous.

*(2) Waiver.*

 Having sustained the trial judge's finding regarding initiation by the accused, we now turn to *Edwards'* second prong. The question is whether Morris' purported waiver of the right to counsel was knowing and intelligent *Edwards, supra,* 451 U.S. at 486 n. 9, 101 S.Ct. 1880, as well as

"voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *see also Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). The "determination . . . whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst, supra,* 304 U.S. at 464, 58 S.Ct. 1019. The inquiry must begin with the presumption that there has been no waiver of a fundamental constitutional right. *Id.* Here, the burden was on the prosecution to prove that before the second interrogation began—in other words, before Jefferson accused Morris of giving gonorrhea to Rhonda—Morris waived the right to the presence of counsel during that interrogation. *See Bradshaw, supra,* 462 U.S. at 1044, 103 S.Ct. 2830 (plurality opinion).

 After giving the question careful consideration, the trial judge first found that Morris' waiver of the right to counsel was knowing and intelligent. According to the judge, Morris must have known and understood that he had the right to the presence of counsel during interrogation because he had invoked that right, only minutes before his request to speak to Sergeant Randall again, by declining to answer questions without an attorney. In addition, the judge credited the uncontradicted testimony of a Secret Service officer, who related that he had arrested Morris in October 1994 (only four months prior to Rhonda's death) for armed robbery, and that on that occasion he had advised Morris of his *Miranda* rights from a PD–47 advice-of-rights card. According to the officer, Morris had stated that he understood his rights and had refused to answer any ques-

---

20. Actions often speak louder than words, even when these words have been spoken by an obviously candid witness. The very fact that Sergeant Randall told Morris that she could not discuss his case with him could suggest to a reasonable factfinder that she believed such a warning to be necessary because otherwise Morris *would* start talking about his case. *Cf. Bradshaw, supra,* 462 U.S. at 1046, 103 S.Ct. 2830 (plurality opinion) ("[t]hat the police officer . . . understood [an inquiry by the accused as relating generally to the investigation] is apparent from the fact that he immediately reminded the accused that 'you do not have to talk to me . . . .' ").

tions without counsel present.[21] There was thus ample evidence to support the judge's finding that Morris not only knew what his rights were but had also successfully exercised them in the recent past.[22]

■ The more difficult question is whether the prosecution proved that prior to Jefferson's interrogation of him, Morris intentionally waived his right to counsel; *i.e.*, whether he revoked his prior refusal to answer questions without an attorney. Concededly, Morris never expressly stated that this was his intention, although he arguably implied that it was by asking Sergeant Randall why she would not discuss his case with him. Moreover, Morris seemed to accept Sergeant Randall's ground rules by saying "OK." [23]

The trial judge was not insensitive to the difficulty of the issue. But because feelings are facts,[24] and because he was the trier of fact, the judge attempted to get to the bottom of the psychological factors that led this nineteen-year-old defendant to ask to talk to the detective so soon after he had declined to answer questions without a lawyer. The judge carefully observed Morris on the videotape, and he saw a basically decent young man who was shocked by the consequences of what he had done and who felt a need to "get it off his chest." The judge stated:

> I mean, I had a chance to watch his demeanor on the tape. I don't think he's, you know, some hard core criminal. Circumstances may have [arisen] that, you know, caused this situation to somehow occur. Who knows? But in any event, I think probably *he's a basic[ally] maybe decent human being,* I have no reason to think otherwise, and from my observations of him on the tape that was the impression that I got.
>
> He said, "yes, sir," "no, sir," in response to questions that were asked of him. He seemed mannerly. *He seemed obviously upset about what had taken place and sorry about what had taken place. And I think the evidence indicates in his own mind that he decided after thinking about this that he needed to get this off his chest and talk about it.*

(Emphasis added.) *Cf. Hawkins, supra,* 461 A.2d at 1031 (defendant stated that he "wanted to get it off his chest").

In other words, working backwards from Morris' appearance on the videotape, and considering the record as a whole, the judge found that it was this very familiar human motivation—a motivation that Morris shared with Dostoevski's Raskolnikov, with a succession of otherwise "bad guys" on "NYPD Blue," and with countless flesh-and-blood defendants who have been unable to "keep the lid on" over their feelings of remorse and guilt—that led Morris to renew his conversation with Sergeant Randall, and thereafter, to "tell the truth about what happened to Rhonda."

We recognize that the burden was on the government and that waivers of constitutional rights are not readily inferred. Perhaps another trier of fact would have weighed the

---

**21.** In the armed robbery case, Morris was subsequently put in touch with one of the attorneys who represented him in the present case.

**22.** It is undisputed that the police did not read Morris his *Miranda* rights for a second time before the interrogation by Detective Jefferson. In *Velasquez, supra,* the court concluded, under very similar circumstances, that the failure of the officers to provide fresh *Miranda* warnings "impacts only slightly on the validity of the defendant's waiver" because only thirty minutes had elapsed between the first warning and the defendant's re-initiation. 885 F.2d at 1087. In the present case, the trial judge expressed agreement with the analysis in *Velasquez,* and so do we. *See also Rogers, supra,* 483 A.2d at 285 (holding that new *Miranda* warnings were not required following the defendant's initiation of new discussions).

**23.** Morris seems to argue in his brief that Morris' "OK" proves that Morris wanted to discuss only matters other than the charges against him. The trial judge did not agree with this contention, and neither do we. Morris' willingness to accept a conversation with Sergeant Randall's proposed restriction on the subjects to be discussed is not inconsistent with willingness on his part to discuss other matters as well.

**24.** "[T]he state of a man's mind is as much a fact as the state of his digestion." *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (quoting *Edgington v. Fitzmaurice,* 29 Ch. Div. 459, 483 (1885)).

evidence differently. But it was the judge's call, not ours. The type of factual issue here presented, focused as it is on a defendant's state of mind, trumpets the inadequacy of a paper record and renders it a quintessential example of Judge Frank's "dehydrated peach." We therefore sustain the judge's finding that Morris waived his right to the presence of counsel during questioning.

### (3) A comparison with Edwards.

Because Morris' appeal, at least as to the videotaped confession, rests heavily on *Edwards* and its progeny, we think it fruitful to compare the facts of *Edwards* with the record in this case.

Having been arrested and charged with robbery, Edwards was advised of his rights in accordance with *Miranda*. He initially indicated that he was willing to submit to questioning. After indicating that he might want to negotiate a resolution of the charges, however, Edwards stated that "I want an attorney before making a deal." The officers discontinued the questioning and took Edwards to jail.

On the following morning, a guard told Edwards that police detectives wanted to speak to him. Adhering to the position he had taken the previous day, Edwards responded that he did not wish to talk to anyone. The guard told Edwards, however, that Edwards "had to" talk to the detectives, and he brought Edwards to them. The detectives told Edwards that they wanted to talk to him and advised him of his rights. After further interrogation, Edwards gave the police an oral statement acknowledging his guilt.

Edwards' confession was thus obtained by the police after he had been ordered to talk to the detectives notwithstanding his prior refusal to do so without counsel. Indeed, Edwards had twice indicated his unwillingness to talk to the police without a lawyer, once at the original interrogation and once to the guard on the following day. The interrogation which culminated in the confession was initiated by the police, not by Edwards, and Edwards only spoke to the detectives because the guard had told him that he was obliged to do so and had no choice. It was in this context—a scenario in which the defendant may very well have been effectively coerced into waiving his constitutional right to representation by counsel during questioning—that the Court in *Edwards* fashioned a "prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was." *Bradshaw, supra*, 462 U.S. at 1044, 103 S.Ct. 2830 (plurality opinion).

The present case is dramatically different. Here, upon Morris' refusal to answer questions without an attorney, the police terminated all substantive conversations with him. Thereafter, discussions were resumed only after Morris himself requested that this occur. Even after Morris had made this request—after, as the judge found, Morris was ready to talk to Sergeant Randall about Rhonda's death—Sergeant Randall attempted to place that subject off limits during the conversation that was to follow. Although Detective Jefferson's perhaps improvident accusations about transmitting gonorrhea to Rhonda might reasonably be viewed as contrary to Sergeant Randall's ground rules for the discussion, these ground rules went well beyond anything required by *Edwards*. In any event, no reasonable person could view this case as one in which the police attempted to coerce or badger an unwilling Morris into talking to them without the assistance of an attorney.

The prophylactic *Edwards* rule draws a bright line for those cases in which the suspect has invoked his right to counsel and has not initiated a new discussion with the police. The doctrine of *Edwards* cannot, however, be uncritically applied where, as here, the conversation which led to the confession occurred at the suspect's request. When it is the accused who seeks to reopen the dialogue, he creates a situation different in kind from the scenario that gave birth to *Edwards'* prophylactic rule.

The Supreme Court has deemed it "timely again to remind counsel that words of our opinions are to be read in the light of the facts of the case under discussion.... General expressions transposed to other facts are

often misleading." *Armour & Co. v. Wantock*, 323 U.S. 126, 132–33, 65 S.Ct. 165, 89 L.Ed. 118 (1944). As one court has aptly stated:

> the motivating factor behind the *Edwards* rule is to protect against and to discourage police interference with the free exercise of the right to counsel.... [T]he cases following *Edwards* are clearly indicative to us that in the absence of some police interference with the exercise of the right to counsel of the accused, the *Edwards* rule is to be strictly and narrowly applied.... Our court has, in other words, rejected an interpretation of *Edwards'* prophylactic rule that is divorced from the context of badgering police conduct from which the rule sprang.

*Plazinich v. Lynaugh*, 843 F.2d 836, 838–39 (5th Cir.1988), *cert. denied*, 488 U.S. 1031, 109 S.Ct. 841, 102 L.Ed.2d 973 (1989) (citation and internal quotation marks omitted). We find this analysis persuasive.

## III.

### CONCLUSION

Apparently enraged by a little three-year-old girl's crying, Aaron Morris punched her in the stomach several times, causing her death. His guilt is not in question. Indeed, he described his crime in some detail in a videotaped statement and subsequently at trial.

There is no doubt that at the time he confessed, Morris was well aware of his right to counsel. Indeed, he had invoked that right earlier in the afternoon, and also in an unrelated case four months earlier. Morris does not claim, nor could he, that his confession was coerced or involuntary in the common everyday sense of these words. In fact, the judge found that Morris resumed his discussions with the police, and thereafter confessed his crime, in order to relieve his sense of guilt and to get his terrible secret off his chest.

Under these circumstances, Morris can prevail, if at all, only upon the theory that the police violated *Edwards'* prophylactic rule in securing his confession. We are satisfied that the Supreme Court did not intend the doctrine of *Edwards* to apply to facts such as those found by the trial judge here. To extend the *Edwards* rule to a case so unlike *Edwards* would not advance *Edwards'* basic purpose—to inhibit the badgering by police of suspects who wish to be represented by counsel—but would deny the court and jury access to probative and compelling evidence. That is not a result that we can readily countenance, and we are satisfied that *Edwards* does not require it.

Morris' conviction of involuntary manslaughter is affirmed. His conviction of cruelty to children is vacated. The case is remanded to the trial court for resentencing. See note 1, *supra*.

*So ordered.*

TERRY, Associate Judge, concurring in part and dissenting in part:

I agree with my colleagues that appellant's initial oral statement that he punched Rhonda in the stomach was properly admitted into evidence, and that appellant's reliance on *United States v. Gayden*, 492 A.2d 868 (D.C. 1985), is unavailing. However, I am convinced that the videotaped confession, which followed a few minutes later, was obtained in violation of appellant's rights under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Because its admission into evidence was not harmless error, I would reverse appellant's conviction and remand the case for a new trial.

## I. THE ORAL STATEMENT

The Supreme Court has held that the statement of a defendant obtained through the exploitation of an unlawful seizure[1] may

---

1. "[W]hen [an] officer by means of physical force or show of authority, has in some way restrained the liberty of a citizen," that citizen has been seized within the meaning of the Fourth Amendment. *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *see*

*Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Hawkins v. United States*, 663 A.2d 1221, 1225 (D.C.1995); *Brown v. United States*, 590 A.2d 1008, 1013 (D.C.1991). Neither the expressed intent of the officer nor the subjective belief of the person detained is con-

not be used in evidence against that defendant. *Dunaway v. New York*, 442 U.S. 200, 216–219, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In this case, therefore, the first question the court must answer is whether appellant was seized in violation of the Fourth Amendment at the time of his admission to Detective Jefferson, in Sergeant Randall's presence, that he had "punched [Rhonda] in the stomach." *See Hawkins, supra* note 1, 663 A.2d at 1225 (whether defendant was "seized" is a question of law). Appellant does not argue that he was seized when he was first brought to the police station by Detective Owens and questioned by Sergeant Randall. *See Bridges v. United States*, 392 A.2d 1053, 1056 (D.C.1978) (person who "freely elects to enter into or continue an encounter with police" by coming to police station for interview is not under arrest), *cert. denied*, 440 U.S. 938, 99 S.Ct. 1286, 59 L.Ed.2d 498 (1979). Rather, he maintains that his voluntary presence became a seizure when Detective Jefferson began rejecting his responses to questions. He claims that Detective Jefferson "bore down" on him and that the "tone of interrogation turned sharply accusatory and confrontational." Therefore, since the police indisputably lacked probable cause at this point in the encounter,[2] appellant asserts that he was subjected to an unlawful seizure.

In support of his argument, appellant relies primarily on *United States v. Gayden, supra*, a murder case in which the victim, shortly before he died, identified his murderer as "Poochie ." Several days later the police learned that the victim knew Mark Gayden, who went by the nickname "Poochie." When the police went to Gayden's home, he readily agreed to accompany them to the station to answer some questions. Over the course of five hours, a detective questioned Gayden twice and received inconsistent statements from him. Because of these inconsistencies, the detective doubted Gayden's veracity and

decided to confront him a third time, but this time with a "fresh face." The second interrogator told Gayden that he knew Gayden was lying because the victim had identified him as the shooter. To this statement Gayden responded, "Yes, I shot him." The officer then stopped the interrogation and read him his *Miranda* rights [3] for the first time. On appeal, we affirmed a trial court order suppressing that statement, upholding the court's finding that although Gayden had not been seized when he made his first two inconsistent statements, the "circumstances existing" prior to his third statement "indicated the police were convinced that Gayden had killed [the victim], and that Gayden was not free to leave . . . ." 492 A.2d at 873.

*Gayden* is readily distinguishable from the instant case. In *Gayden*, as a result of inconsistencies between the defendant's first and second statements, the officers "decided to 'stall' " in order to keep the defendant at the police station. *Id.* at 871. Moreover, after concluding that the defendant was lying, an officer who had not previously spoken to the defendant "confronted" him and told him that the victim had identified him as the assailant. By that time the defendant had been in the same room at the police station for more than five hours and had been interviewed twice.

In the case at bar, by contrast, appellant had been at the police station for a little less than three hours and had been interviewed only by Randall and Jefferson, together, before he volunteered his incriminating remark. Moreover, although Jefferson apparently became skeptical of appellant's story, he did nothing more than to tell appellant that he did not believe certain events had happened as appellant had related them. *Compare United States v. Allen, supra* note 1, 436 A.2d at 1309 (holding that a seizure occurred when defendant was told he had to go with police to homicide office, was under constant

---

trolling on the issue of whether a seizure has occurred. *United States v. Allen*, 436 A.2d 1303, 1309 (D.C.1981); *Giles v. United States*, 400 A.2d 1051, 1054 (D.C.1979). "The test is whether under all of the circumstances a 'reasonable man' innocent of any crime would have thought he was not free to leave." *Gayden, supra*, 492 A.2d at 872 (citations omitted).

**2.** At the suppression hearing, the government conceded that it did not have probable cause to arrest appellant until he admitted punching Rhonda in the stomach.

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

guard, was subjected to tests for gunpowder residue, and was questioned for more than four hours). Most importantly, nothing in the record here suggests that the police were "stall[ing] in order to gather information that would provide probable cause to arrest appellant." *Johnson v. United States,* 616 A.2d 1216, 1230 (D.C.1992), *cert. denied,* 507 U.S. 996, 113 S.Ct. 1611, 123 L.Ed.2d 172 (1993); *compare Gayden,* 492 A.2d at 871 (police admitted that bringing in a new officer was part of a deliberate interrogation "technique" designed to elicit an admission).

Appellant makes much of Sergeant Randall's testimony that if appellant, before he made his statement, had been "adamant" in asking to leave, she "probably would have let him go." We have held, however, that the testimony of an officer as to whether he or she would have actually let the defendant go, had he asked to go, is not conclusive on the issue of seizure. *See Patton v. United States,* 633 A.2d 800, 815 (D.C.1993) (finding no unlawful seizure despite officer's testimony that he would not have let defendant leave if he had desired to do so); *cf. Giles,* 400 A.2d at 1054 (evidence showed that defendant was free to go at all times; his "subjective belief as to whether he was under arrest [was not] determinative").[4] A defendant's failure to ask to leave, as in this case, is certainly a relevant factor, but it is not dispositive. *See Patton,* 633 A.2d at 815; *Allen,* 436 A.2d at 1309.

Although appellant's legal posture may have worsened as the day progressed, *see Giles,* 400 A.2d at 1055, one cannot conclude on the present record that he was seized and in custody at the time he made his admission. There was thus no Fourth Amendment violation and no reason to suppress appellant's oral statement under *Dunaway v. New York* and its progeny.

## II. THE VIDEOTAPED CONFESSION

The videotaped confession is another matter entirely; it implicates not the Fourth Amendment but the Fifth. In arguing for reversal, appellant invokes the rule estab-

lished in *Miranda v. Arizona, supra* note 3, that if an accused, during a custodial interrogation, "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking, there can be no questioning." 384 U.S. at 444–445, 86 S.Ct. 1602. I believe that this rule was violated and that the videotaped confession should have been suppressed.

### A. Relevant Facts

Immediately after appellant admitted that he had punched Rhonda in the stomach, Sergeant Randall placed him under arrest and read him his rights from a PD–47 "Advice of Rights" card. Appellant replied that he understood his rights, that he wanted to remain silent, and that he would not answer any questions without a lawyer. He then signed the PD–47 card, and Sergeant Randall, Detective Jefferson, and another officer, who had been observing the interview for a few minutes, left the room.

Soon thereafter Sergeant Randall told Detective Whalen what had happened, and Whalen went into the interview room to obtain from appellant certain biographical information which he needed for processing. Whalen testified that he did not ask appellant any questions about the case because he knew that appellant "had invoked his rights." Appellant, however, asked Whalen "if it would be possible to speak to Sergeant Randall." Whalen responded, "Yes," and after obtaining the processing information he was seeking, told Randall that appellant wished to speak to her.

When Sergeant Randall returned to the interview room, appellant asked her if she would "stay in there and talk to him." Randall said she would, but they could not talk about his case because "he had indicated he didn't want to answer any further questions and ... he didn't want to answer any further questions without a lawyer." To this appellant replied, "Okay." Randall testified that she did not construe appellant's request to talk as an attempt to renew discussions

---

4. *But see Campbell v. United States,* 273 A.2d 252, 254 (D.C.1971) ("it is always more difficult, and sometimes impossible, to find voluntariness absent a statement to the suspect informing him of his right to leave").

about the case; rather, she believed he "just wanted some company" because he was "lonely."

Appellant proceeded to tell Sergeant Randall and Detective Jefferson, who came into the room shortly after Randall,[5] about his upbringing and his experience in the Job Corps. He also began to tell them that he had been "in some trouble one time about riding in a stolen car," but Randall interjected that she "really didn't want to hear anything about that." Detective Jefferson testified that, after appellant made a few comments about living with his grandfather in North Carolina, he suspected that the grandfather had molested him and that this might explain why appellant had hurt Rhonda. In order to see "what kind of reaction" he would get, Jefferson accused appellant of having sexual contact with Rhonda and giving her gonorrhea.[6] Appellant denied these allegations. Then, according to Sergeant Randall's testimony, Jefferson asked appellant if he had ever been to jail, asked him how much he weighed, and said that appellant appeared to be "a little light in the pants."

Jefferson testified that appellant continued discussing his life, but when appellant brought up his relationship with Rhonda's family, Jefferson and Randall both told him that they could not talk about that. Randall testified that appellant then said, "I might as well go on and tell you what happened to Rhonda."[7] Randall told him that he would first have to sign another PD–47 card waiving his rights, and then he could give either a written or a videotaped statement. Appellant agreed to make a videotaped statement.

**5.** Jefferson testified that he was sleeping at his desk when Randall woke him and told him to come back into the interview room because appellant wanted "to tell us about his life."

**6.** Jefferson testified:
I asked him if his penis was dripping. He said, "What?" I said, "Does your penis drip, or are you having problems with it?" He said yes. I said, "You've got gonorrhea because you gave it to the baby." He said no. I said, "Didn't you rub your penis all over her?" He said no. I said, "Well, why has she got gonorrhea, then?" And he kept saying no to that.

On the videotape, Detective Jefferson re-advised appellant of his rights, and appellant signed another PD–47 card. He then stated that Rhonda had "used the bathroom on herself," and that he "put her in the tub with the hot water and it pulled the skin off her feet." He admitted grabbing and squeezing Rhonda's neck and then hitting her in the stomach. Appellant said he was sorry and explained that he was "stressed out" at the time of the incident. He denied having any sexual contact with Rhonda.

The court denied appellant's motion to suppress the two statements. It held, first of all, that before appellant admitted punching Rhonda in the stomach, the police did not have probable cause to arrest him. The court also held, however, that even though he might have been "a focus of the investigation," he was not in custody for *Miranda* purposes until after he admitted punching Rhonda. At that point he was arrested and advised of his rights, which he fully understood; indeed, he invoked his right to remain silent and his right to counsel. The court found that once he did so, Sergeant Randall and the other officers ended their interrogation.

Then, as Detective Whalen was obtaining booking information from him, appellant asked to speak again with Sergeant Randall. At that point, the court said, it would "have to weigh all reasonable inferences against the government because it is the government's burden ... of showing that there was a waiver of the *Miranda* rights." During the ensuing interview, the court concluded, Detective Jefferson made some statements to appellant that "have to be construed as interrogation."[8]

The medical examiner's report said nothing about any injury to Rhonda's genital area and did not mention gonorrhea.

**7.** The parties do not agree on whether appellant's stated willingness to talk about Rhonda's death came before or after Jefferson asked him about his sexual health and accused him of molesting Rhonda.

**8.** Nevertheless, the court ruled that there was no *Edwards* violation, as outlined in the majority opinion.

At the trial which followed, appellant testified in his own defense. He recounted Valerie's comings and goings on the night of February 3. He also said that the children's behavior had been unruly that evening and that the apartment itself was dirty and unheated. Appellant admitted that he "got angry" when Rhonda defecated on herself and that he "snatched her by the arm [and] took her toward the bathroom." After removing her clothes, appellant "stood her up in the bathtub, turned on the hot water, just turned it on, and peeped out in the hallway to see what the other kids were doing. That's when Rhonda screamed." Appellant continued:

> She was at the back of the tub, with the hot water on her foot. And I went in there, grabbed her by the neck, picked her up out of the tub, dropped her on the floor. Then she was crying and screaming, so I pushed my hand over her mouth real hard, to stop her from screaming. That's when I punched her in the stomach . . . punched her a few times, punched her hard, picked her up by her neck, pushed her back . . . toward the hallway.

Appellant denied burning Rhonda with a cigarette and said that the only injury he noticed on Rhonda's body before putting her to bed was a burn on her foot from the hot water. He said that when he heard Rhonda choking, he tried to resuscitate her because he did not want her to die.

## B. The Edwards Violation

In Edwards v. Arizona, supra, the Supreme Court found it "inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." 451 U.S. at 485, 101 S.Ct. 1880. Consequently, the Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Id. at

484, 101 S.Ct. 1880 (footnote omitted). The Court further held that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484–485, 101 S.Ct. 1880.

Edwards "established [a] prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." Michigan v. Harvey, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (citation omitted); see McIntyre v. United States, 634 A.2d 940, 944 (D.C.1993). Under Edwards there is a two-part test for admissibility of a suspect's responses to further questioning after the suspect's invocation of his Miranda rights has caused prior questioning to be stopped or suspended. "The inquiries are separate, and clarity of application is not gained by melding them together." Oregon v. Bradshaw, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion). First, the government must demonstrate that the suspect initiated further discussions with the police. Smith v. Illinois, 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). Inquiries or statements related to "routine incidents of the custodial relationship" will not suffice to show re-initiation; rather, the suspect must have manifested "a desire . . . to open up a more generalized discussion relating directly or indirectly to the investigation." Oregon v. Bradshaw, 462 U.S. at 1045, 103 S.Ct. 2830; see McIntyre, 634 A.2d at 944. Second, the government must establish that the suspect waived the rights he previously invoked, Smith v. Illinois, 469 U.S. at 95, 105 S.Ct. 490, and that the purported waiver was knowing and intelligent in light of all the circumstances. Edwards, 451 U.S. at 486 n. 9, 101 S.Ct. 1880; see also Arizona v. Roberson, 486 U.S. 675, 680, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

In this case the trial court held, and I fully agree, that appellant was subjected to interrogation [9] when Detective Jefferson accused

---

9. See Stewart v. United States, 668 A.2d 857, 863 (D.C.1995) (whether police conduct constitutes "interrogation" is a question of law).

him of sexually molesting Rhonda. In *Rhode Island v. Innis,* 446 U.S. 291, 299, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court held that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682 (footnotes omitted). At the suppression hearing, Detective Jefferson made no secret of his purpose. He openly admitted that he accused appellant of sexually molesting Rhonda to see "what kind of reaction I [would] get." *See United States v. Alexander,* 428 A.2d 42, 51 (D.C.1981) (detective admitted making accusatory statements to suspect as a "technique" to elicit an incriminating response). We must therefore determine whether appellant had already re-initiated discussions about the case and waived his Fifth Amendment rights at this point in the custodial relationship.[10] *See Smith v. Illinois,* 469 U.S. at 95, 105 S.Ct. 490; *Oregon v. Bradshaw,* 462 U.S. at 1045–1046, 103 S.Ct. 2830. It is on this issue that I part company with my colleagues in the majority.

The government argues that appellant re-initiated discussions with the police when he expressed a desire to speak with Sergeant Randall even after she had advised him that she could not talk to him about the case. This argument, in my opinion, is factually and legally flawed. Factually, appellant's response of "Okay" to Sergeant Randall's warning cannot be deemed anything more than his assent to what Randall had just said, namely, that they could not discuss the investigation; it was not an invitation to explore what had happened between him and Rhonda.[11] Legally, this court has held that "[w]here the officer understands that the

suspect has asserted his [Fifth Amendment rights], the fact that someone else could have believed otherwise, or been confused, is irrelevant." *Stewart v. United States, supra* note 9, 668 A.2d at 864. Sergeant Randall testified that she understood appellant did not want to talk about the case. She even interrupted and stopped him several times when he began to discuss anything other than general information. Moreover, when Sergeant Randall invited Detective Jefferson to rejoin her in the interview room, she simply told him that appellant wanted "to tell us about his life." There is no evidence to suggest that Randall believed appellant was about to waive his previously invoked *Miranda* rights and resume the conversation about the events that had led to his arrest. It was plainly not appellant (or Sergeant Randall) who re-initiated discussions about the case, but Detective Jefferson, contrary to the teaching of *Edwards.* I would hold that Detective Jefferson violated appellant's rights under *Edwards* when he began making statements to appellant which, as the trial court found, "have to be construed as interrogation."

The government relies on *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), and *United States v. Mitchell,* 293 U.S.App.D.C. 24, 951 F.2d 1291 (1991), *cert. denied,* 504 U.S. 924, 112 S.Ct. 1976, 118 L.Ed.2d 576 (1992), for the proposition that an officer's subjective assessment of whether an accused has re-initiated discussions is irrelevant. The issue presented in both of those cases, however, was whether the defendant had been seized within the meaning of the Fourth Amendment, resolution of which required the court to determine "whether … a 'reasonable man' innocent of any crime would have thought he was not free to leave." *United States v. Gayden,*

---

**10.** The trial court found, and the government does not dispute, that appellant initially invoked his right to counsel. *See Smith v. Illinois,* 469 U.S. at 95, 105 S.Ct. 490 ("the threshold inquiry [is] whether [the suspect] invoked his right to counsel in the first instance"); *see also Davis v. United States,* 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) ("The applicability of … *Edwards* requires courts to 'determine whether the accused actually invoked his right to counsel' " (citations omitted)).

**11.** *Compare Oregon v. Bradshaw,* 462 U.S. at 1042, 103 S.Ct. 2830 (re-initiation found when accused asked, "Well, what is going to happen to me now?"); *McIntyre v. United States,* 634 A.2d at 944 (re-initiation found when accused asked what charges he faced); *Rogers v. United States,* 483 A.2d 277, 284 (D.C.1984) (murder suspect re-initiated discussions by stating, "I had to sacrifice him"), *cert. denied,* 469 U.S. 1227, 105 S.Ct. 1223, 84 L.Ed.2d 363 (1985).

*supra,* 492 A.2d at 872 (citations omitted). The focus of that inquiry is necessarily on the perspective of the defendant, not the police; the officer's state of mind is irrelevant in a Fourth Amendment analysis. *Whren,* 517 U.S. at 813, 116 S.Ct. 1769; *Mitchell,* 293 U.S.App.D.C. at 28, 951 F.2d at 1295; *see Gayden,* 492 A.2d at 872; *Giles,* 400 A.2d at 1053. Contrarily, in the context of the Fifth Amendment, the officer's subjective assessment is relevant insofar as the officer understands that the suspect does not wish to re-initiate any discussion about the case. *See Stewart, supra* note 9, 668 A.2d at 864. A key purpose of *Edwards* and its progeny is to provide police officers who conduct interrogations with clear rules about when questioning must cease and cannot be continued. *See Minnick v. Mississippi,* 498 U.S. 146, 151, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); *Arizona v. Roberson, supra,* 486 U.S. at 682, 108 S.Ct. 2093. To ignore the officer's understanding of whether the suspect has changed his mind, after exercising his *Miranda* rights, and decided to re-initiate the discussion would frustrate that purpose. *See Davis v. United States, supra,* 512 U.S. at 458–459, 114 S.Ct. 2350.[12]

The government attempts to demonstrate that appellant waived his previously invoked rights by pointing out that he was calm and rational during the videotaped confession. *See Everetts v. United States,* 627 A.2d 981, 984 (D.C.1993) (in finding voluntary waiver, trial court noted that defendant showed no "apparent effects of being intimidated or threatened or being scared" during videotaped statement), *cert. denied,* 513 U.S. 848, 115 S.Ct. 144, 130 L.Ed.2d 84 (1994). Appellant's demeanor during the later videotaped confession, however, is irrelevant to the question of whether he voluntarily waived his rights earlier, before Detective Jefferson's interrogation. *See Edwards,* 451 U.S. at 484, 101 S.Ct. 1880 ("a valid waiver of [the right to counsel] cannot be established by showing

only that [the defendant] responded to further police-initiated custodial interrogation").

Finally, the government argues that even if appellant's videotaped statement was erroneously admitted into evidence, in violation of *Edwards,* its admission was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This standard requires us to decide "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963) (cited in *Chapman,* 386 U.S. at 23, 87 S.Ct. 824). Reversal of the conviction is required unless, "once the tainted evidence is excluded from consideration, there remains overwhelming evidence to support the jury's verdict." *Smith v. United States,* 529 A.2d 312, 318 (D.C.1987) (citation omitted). The government contends that appellant's trial testimony made any error harmless because it covered much of the same ground as the videotaped statement, and because appellant testified to negate the compelling evidence of guilt. *See Lewis v. United States,* 483 A.2d 1125, 1133–1134 (D.C.1984).

I read the record differently. When a defendant testifies at trial "in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony [is] tainted by the same illegality that rendered the confessions themselves inadmissible." *Harrison v. United States,* 392 U.S. 219, 223, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) (footnote omitted). "Such tainted testimony 'cannot be considered as independent evidence of guilt for purposes of applying the harmless error rule.'" *Smith v. United States,* 529 A.2d at 318 (citation omitted). In this case it is apparent, at least to me, that appellant's trial testimony was tainted, within the meaning of *Harrison,* by the introduction of the videotaped confession. Given the extremely detailed nature of that confession, appellant had little choice but to

---

12. This is not to say, however, that an officer's subjective assessment that a suspect does wish to re-initiate discussions about the case will be controlling. *See Arizona v. Roberson, supra,* 486 U.S. at 687, 108 S.Ct. 2093 (*"Edwards* focuses on the state of mind of the suspect and not of the

police"). *But see Oregon v. Bradshaw, supra,* 462 U.S. at 1046, 103 S.Ct. 2830 (discussing the fact that the interrogating officer "understood" that the suspect wanted to engage in discussion about the investigation).

testify in the hope of lessening its damaging impact. I am not convinced, beyond a reasonable doubt, that appellant would have testified anyhow even if the videotape had never been seen by the jury. On the contrary, his trial testimony appears to have been an attempt to minimize or explain away the details of the videotaped confession, which was far more graphic and inculpatory than his simple statement that he had punched Rhonda in the stomach. *See Harrison*, 392 U.S. at 223, 88 S.Ct. 2008 (in applying harmless error test, court must look to see why appellant chose to testify).

Thus, excluding from consideration both the videotaped confession (under *Edwards*) and appellant's trial testimony (under *Harrison*), I would hold that the remaining evidence was not sufficient to assure that the error in admitting the confession was harmless. The videotape was extremely damaging to appellant's cause. Indeed, the government presented little else; there was no eyewitness testimony and no physical evidence linking appellant to the death of the victim. I would therefore reverse the judgment of conviction and remand the case for a new trial.