**Errol Wayne McINTYRE, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 89–CF–658.

District of Columbia Court of Appeals.

Argued April 19, 1993.

Decided Aug. 26, 1993.

Billy Ponds for appellant. Michael L. Spekter, Washington, DC, filed the brief.

Margaret R. Batten, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at time

brief was filed, and John R. Fisher, Roy McLeese, III, Ronald Dixon, and Kathleen O'Connor, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before SCHWELB, KING and SULLIVAN, Associate Judges.

KING, Associate Judge:

Appellant was convicted of two counts of armed felony murder, and single counts of armed first-degree murder,[1] armed second-degree murder,[2] armed second-degree burglary,[3] arson,[4] destruction of property,[5] and carrying a pistol without a license.[6]

On appeal, he raises only two claims that require more than summary consideration. Appellant contends that: (1) "the trial court erred in failing to suppress the statements and confession . . . obtained in violation of his constitutional rights," and (2) that District of Columbia police officers lacked the authority to seize or arrest him in Silver Spring, Maryland. We affirm but remand for resentencing with directions that the trial court vacate all but one murder conviction for each victim. *See Byrd v. United States,* 510 A.2d 1035 (D.C.1986) (felony murder and first-degree murder convictions for one victim must merge); *see also Thacker v. United States,* 599 A.2d 52, 63 (D.C.1991) (a defendant may only be convicted of one murder when there is only one killing).

## I.

In the late afternoon of December 2, 1987, Detectives Willie Jefferson and Norman Brooks, of the Metropolitan Police Department, arrived at 1513 Buchanan Street, N.W., where fire fighters had extinguished a fire in the premises. The lower level was flooded with water and the basement was "burned real bad." The detectives discovered the body of a female, later identified as Marcia Blackstock, with electrical wires wrapped around the neck and a blade "protruding from the chest and back area." The woman had been severely burned in the fire and had cuts on her face. The detectives learned that a second victim, 78-year-old Mabel Gordon, had been taken to the hospital and pronounced dead. Detective Jefferson also noticed that blood had been smeared on the wall outside the basement door.

An autopsy later revealed that Gordon had died from two bullet wounds, one to her abdomen and the other to her pelvis. In addition to thirteen "cutting wounds," Blackstock sustained two bullet wounds. Blackstock also suffered three stab wounds to the back of her neck and one to her abdomen.

The detectives returned to the Homicide Branch at approximately 8:30 p.m., and interviewed Sherron Malcolm, a resident of the Buchanan Street home. Malcolm told Detective Jefferson that her boyfriend, appellant Errol Wayne McIntyre, had threatened to harm her and her family after the couple had a fight the previous night.[7] She also told the detectives that she had seen appellant standing on the front porch of her home shortly before the fire. Malcolm provided a description of appellant, observing that the last time she had seen him he was wearing red Fila sneakers, blue jeans, a baseball cap, and a brown suede or knit jacket. Jefferson then obtained a mug shot photograph of appellant.

Based on this information, Jefferson and Brooks decided to search for appellant. At approximately 11:45 p.m. they left the police station and drove to two nightclubs he was known to frequent. The detectives did not find appellant at either location. They then proceeded to the address in Silver Spring, Maryland, that had been provided to them by Sherron Malcolm, where appellant lived with his mother. When the two detectives arrived at the apartment building, Brooks stood at the front door of the lobby, while Jefferson scanned the mailboxes to determine appel-

1. D.C.Code §§ 22–2401, –3202 (1989).

2. D.C.Code §§ 22–2403, –3202 (1989).

3. D.C.Code §§ 22–1801(b), –3202 (1989).

4. D.C.Code § 22–401 (1989).

5. D.C.Code § 22–403 (1989).

6. D.C.Code § 22–3204(a) (1992 Supp.).

7. Malcolm testified that appellant had threatened to "come down there and shoot up your house and blow it up."

lant's apartment number. As Jefferson returned to the lobby area, he observed Brooks talking with a man (appellant) who matched the description given by Malcolm. The man was wearing red Fila sneakers, a baseball cap, blue jeans, and a brown jacket. He also had a scarf covering his face. As he neared appellant, Detective Jefferson noticed what appeared to be blood stains on the appellant's shoes. Jefferson also observed that appellant was wearing a single glove (described as a driving glove, not a glove for warmth) on his left hand, leading Jefferson to believe that appellant was attempting to conceal an injury to the hand. Based on these observations, Jefferson believed that the man was the perpetrator of that afternoon's homicides.

Jefferson approached appellant and pulled off the scarf covering appellant's face, exclaiming, "[t]his is the person we're coming to see right here." Jefferson identified himself and Brooks as police officers and asked appellant for identification. Appellant claimed that he was Richard McIntyre and that the officers "want to see my brother. He's upstairs waiting for you." Jefferson requested that appellant walk with him upstairs and, as they began walking toward the stairs, Brooks told Jefferson that appellant had something in his back pocket. As Brooks reached to get the object from appellant's back pants pocket, it fell out. When Jefferson looked to see what had fallen, appellant fled. Although Jefferson pursued appellant he was unable to apprehend him. Jefferson did, however, recover the baseball cap [8] that had blown off appellant's head as he escaped, and the objects that had fallen from his pocket—appellant's passport and a photocopy of his birth certificate. All of these items were admitted into evidence at trial.

Jefferson obtained an arrest warrant for appellant and on January 22, 1988, at approximately 4:25 p.m., Detective Melvin Hemphill and other police officers proceeded to apartment 203 at 1435 Spring Road, N.W., to execute the warrant. Appellant was arrested without incident and advised of his rights. Appellant stated that he understood his rights.

Appellant was then taken to the Homicide Division, placed in an interview room, and handcuffed to a chair. Appellant asked Hemphill what charges were being brought against him. Hemphill told him he thought appellant would be charged with two counts of murder, arson, unlawful flight to avoid prosecution, and (possibly) pulling a gun on the two detectives in Silver Spring. Appellant requested and received a cigarette, and Hemphill then asked appellant if there was anything else he wanted to say. Appellant stated, "Not right now, maybe after I talk to my attorney." Hemphill said nothing further. He then left appellant alone in the interview room.

Shortly afterward, Detective Forrest Hamlin entered the interview room and identified himself. Hamlin testified that he went to the interview room to check on appellant and to tell him that Detective Jefferson would be arriving shortly. Appellant asked Hamlin what charges were being made against him. After Hamlin told appellant that he was charged with murder, appellant asked whom he had supposedly killed. Hamlin then told appellant that the case was assigned to Detective Jefferson and that appellant would have to await Jefferson's arrival at the Homicide office. Later, Jefferson, who had been in court in another matter, arrived and introduced himself. Appellant berated Jefferson for falsely claiming that appellant had drawn a weapon during the December encounter in Silver Spring.[9] Appellant then inquired

---

**8.** The baseball cap was relevant because appellant had previously given the cap to Denoval Samuels, a resident of the Buchanan Street home. At trial, Samuels testified that on the morning before the fire, the cap was still in his room at that address. Appellant's possession of the cap after the murders provided circumstantial evidence that he was inside the Buchanan Street address at some point after Samuels saw the cap there the morning of December 2, 1987.

**9.** In an affidavit in support of the application for the arrest warrant, Detective Jefferson swore that appellant pulled what [he and Brooks] believed to have been a .38 caliber handgun from his jacket. The government now concedes that this information was erroneous and that it was apparently based on what the government euphemistically characterizes as a "mistaken observation by Detective Brooks." It is difficult to make a "mistake" as to whether a suspect has pulled a

about Sherron Malcolm. Jefferson attempted to advise appellant of his rights, but appellant continued to inquire about Malcolm. Finally, as the trial court found, appellant "stated that if Detective Jefferson allowed him to speak with Sherron and did not write anything down or advise him of his rights, he would tell Detective Jefferson anything." Appellant again declined to allow Jefferson to advise him of his rights.

Jefferson observed that appellant seemed to be preoccupied with Sherron Malcolm, and he decided to use that to his advantage. Jefferson then told appellant that on the night of the incident he had tried to comfort Malcolm while she cried, and that some man with dreadlocks had taken her home. Appellant appeared to be upset by this information, and he insisted on seeing Malcolm. Jefferson told appellant that he must first tell the truth about the crime, and that after that he would be permitted to see Malcolm. Appellant then confessed and gave a detailed account of his involvement in the murders. Appellant's confession was subsequently admitted into evidence at trial.

Later that evening, in jail, appellant confessed to another inmate who identified appellant from a photo array. The inmate testified at trial relating the substance of the confession made to him by appellant.

The trial court denied the motion to suppress the items recovered by the police after the attempted arrest in Silver Spring, finding that the police were in fresh pursuit of appellant. The trial court also denied the motion to suppress the confession made to Detective Jefferson holding that although appellant had unequivocally invoked his right to counsel, he subsequently initiated further conversation when he inquired "what the charges were and started talking about this particular offense." The trial court noted that appellant had been arrested before, was familiar with the criminal justice process, and was bargaining with Jefferson and trying to negotiate a deal to see Sherron Malcolm. The trial court concluded that appellant understood that he was using his rights in exchange for a

visit with Malcolm. The trial court also concluded appellant's confession was voluntary.

After reviewing the record, and the comprehensive findings of fact and conclusions of law made by the trial judge, we conclude that she did not err in denying the motion to suppress the confession. We do not decide whether the trial court properly ruled that the police were in fresh pursuit since we are satisfied that if there was error in permitting the introduction of the fruits of the encounter in Silver Spring, the error was harmless beyond a reasonable doubt.

## II.

■ The first question presented is whether the trial court erred in denying the motion to suppress appellant's confession, which is alleged to have been obtained in violation of *Miranda*.[10] On appeal from the trial court's denial of a motion to suppress evidence, "our role is to ensure that the trial court had a substantial basis for concluding that no [constitutional] violation occurred." *Brown v. United States*, 590 A.2d 1008, 1020 (D.C. 1991) (citing *Goldston v. United States*, 562 A.2d 96, 98 (D.C.1989)). "In reviewing a trial court order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Peay v. United States*, 597 A.2d 1318, 1320 (D.C.1991) (en banc) (citations omitted).

We begin our analysis by noting that the Supreme Court established a bright-line rule in *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981), holding that "an accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards* also held that "a valid waiver of that right cannot be established by showing only that [appellant] responded to

---

handgun on an officer. Untrue affidavits by officers charged with enforcing the law compromise the honor and integrity of our system of justice.

10. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

further police-initiated custodial interrogation...." *Edwards, supra,* 451 U.S. at 484, 101 S.Ct. at 1885. The trial judge concluded, however, that it was appellant who initiated conversation with Detective Hamlin and Jefferson. In doing so, the judge relied on *Oregon v. Bradshaw,* 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983), where the Supreme Court held that the statement, "what's going to happen to me now?" constituted "a willingness and a desire for a generalized discussion about the investigation...." *Id.* at 1045–46, 103 S.Ct. at 2835.

■ The trial court was persuaded, as are we, that the question asked by appellant about the charges against him was "much more compelling than those in *Oregon v. Bradshaw.*" The Supreme Court in that case observed that the *Edwards* rule was a prophylactic one "designed to protect an accused in police custody from being badgered by police officers...." *Bradshaw, supra,* 462 U.S. at 1044, 103 S.Ct. at 2834. Appellant does not assert, however, that his confession was the result of coercion or badgering.[11] Consequently, our analysis is guided by whether this was a "bare inquiry ... that [is] so routine that [it] cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Id.* at 1045, 103 S.Ct. at 2835. Here, (as in *Bradshaw* where the suspect asked what was going to happen to him) appellant asked what the charges where. And as in *Bradshaw,* where the officer reminded the accused of his rights, Detective Jefferson attempted on several occasions to read appellant his *Miranda* rights, but appellant insisted that he not do so. We agree with the trial judge that appellant's inquiry about the charges against him was, like a similar question posed by the accused in *Bradshaw,* not a mere routine inquiry, such as "a request for a drink of water or a request to use a telephone...." *Id.* Instead, it constituted "a desire on the part of [appellant] to open up a more generalized

discussion relating directly or indirectly to the investigation." *Id.* Moreover, as the trial court found, appellant had a record of four prior arrests and was familiar with his rights; he "acted with Detective Jefferson in a manner that was manipulative" and "subsequently showed his knowledge of his rights and his clear concise understanding of them when he negotiated for Ms. Malcolm." That conclusion by the trial judge was amply supported by the record before us and on these facts we conclude there was no violation of the *Edwards* rule.

■ The trial court also rejected a claim that appellant's confession was not voluntary, noting that Jefferson used "trickery as a device to obtain a statement ... [but the] trickery was not used as a means to get the defendant to waive his rights ... [because appellant] had already waived those rights." *See Connecticut v. Barrett,* 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987). In reviewing the voluntariness of a confession, "the test is whether, under the totality of the circumstances, the will of appell[ant] was overborne in such a way as to render his confession the produce of coercion." *United States v. Thomas,* 595 A.2d 980, 981 (D.C. 1991) (citations and internal quotations omitted). The trial judge found, as she readily could find on this record, that appellant's "shrewd" conduct in negotiating with Jefferson "showed his knowledge of his rights and his clear concise understanding of them ... they were bargaining as equals." Appellant knew the risk involved in bartering his statement for a visit with Malcolm. He may not now claim that the police dishonesty renders his confession involuntary. Thus, the trial court did not err in ruling that appellant's confession was voluntary.

### III.

■ We consider next the trial court's denial of the motion to suppress tangible evidence. That motion raises an issue never previously considered by this court involving the authority of a District of Columbia police officer who has entered Maryland to pursue

---

11. Instead, appellant asserts that the trickery and dishonesty he was subjected to vitiates any initi- ation on his part.

a criminal investigation. We conclude that we need not reach the issue of whether the police conduct here constituted fresh pursuit since we are satisfied that if the trial court's determination was error, it was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

The court admitted into evidence the baseball cap, the passport identification, and the photocopy of appellant's birth certificate, the items recovered when appellant fled from the officers in Silver Spring. The passport and birth certificate had little or no probative value. The baseball cap, however, provided circumstantial evidence that appellant had been in the house after Samuels left the cap there. Nevertheless, whether or not the actual seizure of the cap was lawful, the officers could testify that they observed appellant wearing the cap when they saw him. *Derrington v. United States*, 488 A.2d 1314, 1329–30 (D.C.1985) *mandate denied* 509 A.2d 605, *cert. denied* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (permitting testimony regarding coat defendant was wearing because evidence was in plain view and therefore falls within exception to exclusionary rule). They could also testify regarding what they observed when they encountered appellant in the lobby, i.e., what he was wearing, that he had spots on his shoes that looked like blood, and that the left hand was gloved in a manner that appeared to be an attempt to conceal a wound. *Id.* Moreover, Denoval Samuels could also properly testify, as he did, about the significance of the baseball cap. Therefore, the cap itself had only marginal probative value beyond that of the testimony of the officers and Samuels. We are, therefore, satisfied that on this record—which includes appellant's confession to Jefferson, his confession to the other inmate, the testimony of Malcolm, and the *observations* by the detectives in the apartment building lobby in Maryland—the evidence is so overwhelming that any error in admitting the baseball cap (and the passport and birth certificate) is harmless beyond a reasonable doubt under *Chapman*.

## IV.

Appellant's other three contentions merit only brief discussion. First, appellant argues that the trial court erred in failing to grant his motion for judgment of acquittal on the armed second-degree burglary charge because the government failed to prove an element of the offense. Viewing the evidence, as we must, in the light most favorable to the government and permitting the jury to determine the credibility of witnesses and to draw reasonable inferences from the facts, we find there was sufficient evidence to support that guilty verdict. *See Bernard v. United States*, 575 A.2d 1191, 1193 (D.C. 1990) (noting that no distinction between direct and circumstantial evidence should be made). We are satisfied that an impartial jury, after hearing the evidence, could conclude beyond a reasonable doubt that appellant had the requisite intent to commit an offense when he entered the premises.

Appellant next argues that the trial court abused its discretion in admitting certain testimony from a government witness. Specifically, appellant claims that the testimony of Denoval Samuels, who described the reaction of family members toward Sherron Malcolm after the fire, was prejudicial and without probative value. Appellant strains to make the argument that this testimony was calculated to create prejudice against him. To do so would require the jury to draw inferences not obvious to this court. Nevertheless, we need not decide whether admission of Samuels' testimony was an abuse of discretion because we are convinced that if there was error, it was harmless. *See Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

Finally, appellant claims the government failed to provide complete discovery regarding the testimony by Samuels about the baseball cap. Since appellant failed to object to that testimony, we would ordinarily review under the plain error standard. *See Harris v. United States*, 602 A.2d 154, 159 (D.C.1992) (reversal appropriate only if there would be a miscarriage of justice). We need not do so, however, since we are satisfied that *testimony*, by itself, is not discoverable under Superior Court Rule 16, and, there-

fore, the trial court did not commit any error, much less plain error, in failing to grant the motion for a mistrial made on the ground that the government had improperly withheld information subject to discovery.

For the reasons stated above, we find no error on the part of the trial judge that warrants reversal. Accordingly, the judgment of conviction is

*Affirmed.*