UNITED STATES, Appellant,

v.

Robert J. LITTLE, Jr., Appellee.

No. 03–CO–452.

District of Columbia Court of Appeals.

Argued Feb. 26, 2004.
Decided June 24, 2004.

Barbara J. Valliere, Assistant United States Attorney, with whom Roscoe C.

Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher and Daniel M. Cisin, Assistant United States Attorneys, were on the brief, for appellant.

Frederick J. Sullivan, for appellee.

Before TERRY, FARRELL, and WASHINGTON, Associate Judges.

FARRELL, Associate Judge:

In this government appeal from the grant of post-conviction relief, *see* D.C.Code § 23–110 (2001), two questions are presented. First, was appellee (hereafter Little) in custody for purposes of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), when in response to police interrogation he gave a written statement implicating himself in the murder of Donnell Perry? Second, if so, did his trial attorney render ineffective assistance of counsel by not filing a pretrial motion to suppress the statement, which the government acknowledges was made without prior advice and waiver of Little's *Miranda* rights? We hold, on the basis of the facts established at the post-conviction hearing, that Little was in custody at the time of the statements to the police and that, under the standards of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the trial court correctly ruled that his Sixth Amendment right was violated, entitling him to a new trial.[1]

## I.

A jury found Little guilty of the armed first-degree murder of Donnell Perry and related weapons offenses. The death resulted from an argument between Perry and the girlfriend of Christopher Williams, which escalated into a fight between Williams and Perry and a resolve by Williams to kill Perry "before he kills me." The government's evidence showed that Williams, Little, and two other men approached Perry thereafter as he was seated in a car, and that Williams and Little each fired gunshots into the car. Shots from one of the guns killed Perry.[2] During its case in chief, the government introduced a written statement that Little had made to the police in which he explained that Perry had previously threatened "to come down shooting" if Williams and his friends did not leave the area. In response to this threat, Little said, he, Williams, and others met to "plan what they were going to do." Williams obtained some guns which he distributed to Little and the others, keeping one for himself, and together they went to Perry's neighborhood to ask him "why was he ... threatening to shoot up [their] place." When they found Perry, he "got smart" with them, provoking one of the group (Donnell Campbell) to instruct Williams, "Shoot him. I'm tired of talking—I don't care any more." Williams then, according to Little, "pulled out his gun and started to fire." Campbell did the same thing, and Little too pulled out his gun, but apparent-

---

**1.** Appellee contends that we lack jurisdiction to entertain this appeal from the grant of the § 23–110 motion because the effect of the ruling was to grant a new trial, something not ordinarily appealable interlocutorily. We reject this argument. *See United States v. Robinson,* 388 A.2d 469, 470 n. 1 (D.C.1978) (defense counsel's concession that the "appeal [by the government] pursuant to § 23–110 is appropriate" was "consistent with federal law recognizing the right of the government to

appeal in habeas corpus cases"). *See also, e.g., United States v. Gordon,* 156 F.3d 376, 378 (2d Cir.1998) (construing 28 U.S.C. § 2255); *Peoples v. Roach,* 669 A.2d 700, 702 (D.C.1995) (in construing § 23–110, "we may rely on [federal] cases construing [§ 2255]").

**2.** Williams was tried separately for his role in the murder.

ly instead of shooting (the statement does not say, but implies, that Little did not fire his gun), he turned around and backed up to make sure that no one else "tried to get into it." Little went on to describe his role as "st[anding] guard" or "watch[ing their] back" while Williams and Campbell fired. After the shooting, the men ran from the scene; Little went to Campbell's house where he planned to stay until "things calmed down."

This court affirmed Little's convictions on direct appeal. He then filed a series of *pro se* motions to vacate his convictions, alleging that his trial counsel had been ineffective for not moving to suppress the written statement to the police before trial. After the trial judge (Eilperin, J.) denied the motions without a hearing, this court reversed and remanded for an evidentiary hearing on the Sixth Amendment issue. *See Little v. United States,* 748 A.2d 920 (D.C.2000). Among other things, the court stated that "[d]espite the trial court's finding of no prejudice under *Strickland*[, *supra*], it is difficult to conceive that the improper admittance of the statement"— assuming it *was* improper—"was harmless." *Id.* at 922.[3]

At the hearing on remand, the motions judge (King, C.J., to whom the case had been transferred) heard testimony about trial counsel's reasons for not having filed the motion to suppress, as well as about the underlying issue of whether Little's statement to the police had been made while he was in custody, thus implicating *Miranda*'s requirements. The judge then issued a written opinion concluding that Little had been in custody at the relevant time and that, under *Strickland,* there was a reasonable probability that the result of the trial would have been different had the

jury not been presented with Little's unwarned written statement. (As we discuss later, the judge did not make the determination required by *Strickland* of whether counsel's failure to move to suppress the statement "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.) The judge granted Little a new trial in accordance with D.C.Code § 23–110(c).

## II.

We consider first the issue of custody, as Little must prevail on his *Miranda* claim for the analysis to proceed further. *See Washington v. United States,* 689 A.2d 568, 572 (D.C.1997) ("[I]f a motion to suppress would not have been successful, then an appellant cannot show the prejudice required by *Strickland* for a finding of ineffective assistance of counsel").

### A.

■ Because the § 23–110 judge held a hearing and received testimony on the custody issue, our standards of review of his conclusion are the same as they would be had a motion to suppress been filed originally. Although "[t]he trial court's legal conclusion[ ] regarding whether the defendant was in custody ... [is] reviewed *de novo,* ... [its] underlying factual findings ... are reviewed under the 'clearly erroneous' standard," and the record must be viewed "in the light most favorable to the party that prevailed in the trial court"— meaning that "we must sustain any reasonable inference that the trial [court] has drawn [in Little's favor] from the evidence." *Morris v. United States,* 728 A.2d 1210, 1215 (D.C.1999) (citations omitted).

---

3. We pointed out that this court, in its unpublished opinion on direct appeal, had "specifically relied on" Little's written statement "in

deciding that there was sufficient evidence to support his conviction." *Little,* 748 A.2d at 922.

▅ "Custodial interrogation" under *Miranda* means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. Although " 'the circumstances of each case must certainly influence' the custody determination, ... 'the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " *Yarborough v. Alvarado*, —— U.S. ——, ——, 124 S.Ct. 2140, 2148, 158 L.Ed.2d 938 (2004) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam)). This in turn requires "two discrete inquiries":

> first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave[?] Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Yarborough* at 2149 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)).

**B.**

In concluding that Little was in custody at the time of the questioning, the motions judge made the following findings of fact. On June 20, 1989, the police executed a search warrant for guns at Little's home on the basis of a statement by Christopher Williams implicating Little in the recent shooting death of Donnell Perry. Little was sixteen years old at the time, had never been arrested, and lived with his mother. He arrived home as the house was being searched. Although no guns were found in the search, the police asked Little to accompany them to the police station to speak with them about the homicide.[4] Little rode to the station in the back of the cruiser, with one detective seated next to him while another drove. Although the record was "unclear" on the point, the judge found that it was "likely that at some point prior to his interrogation" Little was patted down for weapons. At the police station, he was placed in an interview room and the two detectives—Henry and Johnson—then interrogated him for "by all accounts ... several hours." Little was not given *Miranda* warnings, and although he was not handcuffed and the door to the interview room remained open, he was not told that he was free to leave. At some point during the interview the detectives "presented a gun for [him] to view."[5] At the end of the questioning Little made and signed the

---

**4.** Detective James Johnson testified that he had asked Little at the house "if [they] could speak to him in reference to the investigation," and that Little showed no reluctance in assenting. Little testified that the police told him they wanted to "take [him] down" for questioning, and that when he initially refused, they told him he had no choice. Chief Judge King resolved this dispute with the rather neutral finding that Little "was asked to accompany [the] police" to the station.

**5.** Little testified that one detective "slammed" his gun on the table and asked him if it was like the one he had used to shoot Perry. Detective Henry denied having done this, stating that he had merely lifted the butt of his gun from its holster to help Little describe the gun he had admitted to carrying on the scene. The judge resolved this dispute with the finding quoted above.

written statement in question, and was permitted to return home.

### C.

On these facts, the motions judge concluded that "a reasonable person in [Little's] shoes would likely have believed he was in custody." This conclusion, the judge said, did "not turn on the Defendant's age" although he noted that Little was age sixteen at the time, was "at best" a high school student with no prior arrest, and was "not offered the option of having his mother accompany him to the police station." The "coercion inherent in the circumstances of the interrogation" began, in the judge's view, with Little's "arriv[al] ... home to find police officers conducting a search for a weapon suspected to have been used in the commission of a murder," and their "request"—stated neutrally by the judge—for him "to accompany [them] to the homicide office to answer questions about the murder." Little then "rode to the police station in the back seat of a police cruiser with Detective Johnson sitting next to him," and at some point prior to his interrogation "it is likely that ... [he] was patted down." At the homicide office, he "was situated in an interview room" where he was questioned by the two detectives for "several hours," during which a gun was "presented ... for [him] to view." The judge concluded:

> Detectives were the source of the Defendant's transportation to and from the police station and they were adults in a position of authority relative to the juvenile Defendant. If Defendant had wished to leave, he would have had to stop further questioning and ask for or

find his own transportation home. Given the Defendant's age, he was unlikely to have been sophisticated about his right to refuse to accompany police or to leave at any time. A reasonable person in his position would conclude that he could not leave unless and until the detectives gave their permission.

### D.

■ Because the motions judge's findings of fact are not clearly erroneous, we accept them. Further, reviewing *de novo* his conclusion that Little was in custody at the time, we uphold that determination as well.[6] We do so without regard to the fact that Little was a sixteen-year-old juvenile with no previous arrest record. The motions judge stated that Little's age and inexperience were not decisive (his decision did not "turn on" it), but as the government points out—and our recitation of the judge's findings confirms—references to "the juvenile [d]efendant" and "the [d]efendant's age" nonetheless appear throughout the judge's explanation of his reasoning. Accordingly, after oral argument, we postponed resolution of this appeal to await the Supreme Court's decision in *Yarborough v. Alvarado, supra,* in which the Court reviewed a federal circuit court's holding under the law governing federal habeas corpus that the state appellate court had unreasonably applied clearly established law as to the meaning of "custody" in Alvarado's case, primarily because it had "fail[ed] to account for Alvarado's youth and inexperience when evaluating whether a reasonable person in his position would have felt free to leave." *Alvarado,* 124 S.Ct. at 2142. The Supreme Court held, to the contrary, that "the

---

6. This case does not require us to resolve any tension between the *de novo* review standard applied in *Morris, supra,* and other cases to the determination of custody, and occasional statements in our opinions that appear to

inquire (only) whether "a substantial basis" in the record exists for the trial court's legal conclusion. *See, e.g., McIntyre v. United States,* 634 A.2d 940, 943 (D.C.1993).

state court's application of our custody standard was reasonable," *id.* at 2150, which was all that the standards of federal habeas law required. In particular, the Supreme Court's "opinions applying the *Miranda* custody test [had not previously] mentioned the suspect's age, much less mandated its consideration," and "the objective *Miranda* custody inquiry could reasonably be viewed as different from doctrinal tests that depend on the actual mindset of a particular suspect, where we do consider a suspect's age and experience." *Id.* at 2151. Accordingly, "[t]he state court [had] considered the proper factors and reached a reasonable conclusion," *id.* at 2152 and that ended the inquiry.[7]

As is apparent, *Alvarado* did not strictly decide whether an accused's juvenile status is irrelevant to the *Miranda* custody determination. That was unnecessary for its decision.[8] We likewise perceive no need to explore further the relevance of Little's age and inexperience with police at the time of the interrogation, because even excluding those factors from consideration, we conclude that he was in custody. *Alvarado* is instructive for that determination as well.

The *Alvarado* Court noted among the factors "weigh[ing in favor of] a finding

that Alvarado was in custody"—but insufficient to outweigh the state court's "reasonable" conclusion to the contrary—the facts (a) that the police had "interviewed [him] at the police station"; (b) that "[t]he interview lasted two hours, four times longer than the 30–minute interview in [*Oregon v.*] *Mathiason,* [429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam) ]"; and (c) that Alvarado had been "brought to the police station by his legal guardians rather than arriving on his own accord," although—weighing against custody—"[t]he police [had not] transport[ed him] to the station." *Alvarado,* 124 S.Ct. at 2143, 2149. Here, as the motions judge found, Little was questioned for *several* hours in an interview room at the homicide office, after having been frisked (it was "likely" he had been patted down, the judge found) and having traveled to the police station in the back seat of a police vehicle seated next to a detective.[9] Further, Little certainly knew that the police meant business because he had watched as they searched his home for guns, he knew they wanted to "question him about the murder," and he was shown a gun during the interrogation. "All of these objective facts" (to quote *Alvarado*), particularly the hours-long

**7.** The Court went *slightly further* and concluded that the Ninth Circuit's reliance on Alvarado's inexperience with law enforcement was "improper" under the objective *Miranda* test even when reviewed "as a *de novo* matter." *See Alvarado,* 124 S.Ct. at 2152.

**8.** Indeed, Justice O'Connor, who provided the fifth vote for the majority, wrote separately that "[t]here may be cases in which a suspect's age will be relevant to the *Miranda* 'custody' inquiry," but that *Alvarado* was not one of them. *Id.* 124 S.Ct. at 2152 (O'Connor, J., concurring). Justice O'Connor also

opined that the state court had merely "failed *explicitly* to mention Alvarado's age." *Id.* 124 S.Ct. at 2152 (emphasis added). *See also id.* 124 S.Ct. at 2154 (Breyer, J., dissenting) ("The majority *suggests* that the law might prevent a judge from taking account of the fact that Alvarado was 17.") (emphasis added; original emphasis omitted).

**9.** *See,* by contrast, *Morris,* 728 A.2d at 1215–16 (defendant was placed "unrestrained in the front seat of Detective Owens' vehicle—hardly the conventional means of transporting an individual arrested for murder").

questioning by homicide detectives in a police interview room, lead us to conclude that this was not "an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave." *Id.* at 2150.

## III.

Because Little was not given the warnings required by *Miranda*, our determination that he was in custody at the time of the questioning impels the further conclusion that a motion to suppress his written statement would have been successful. Throughout this litigation, the government has not contended that any error in admitting the statement was harmless. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We therefore turn to the question of whether Little's trial counsel rendered ineffective assistance by not having moved to suppress the statement.

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that ... counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. We consider first the government's argument that trial counsel's failure to file the motion to suppress was not deficient performance, then its argument that in any case Little has not shown the requisite prejudice.

## A.

■ The first prong of *Strickland* requires us to decide whether "the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052.[10] Important to that determination is whether, "under the circumstances, the challenged action 'might be considered sound trial strategy,'" *id.* (citation omitted), for "counsel is not ineffective in failing to file a [pretrial] motion if this was a reasonable tactical decision." *Washington,* 689 A.2d at 572. At the post-conviction hearing, trial counsel only weakly asserted that his failure to move to suppress the statement was a tactical decision. He had been familiar with the contents of the statement, he said, but believed that it was not "inconsistent really" with his planned defense that Little was present innocently during the shooting.[11] Under questioning, howev-

10. As the government points out, the motions judge made no decision on this part of the *Strickland* test, stating that "[t]he [c]ourt need only consider the prejudice prong in evaluating [Little's] claim of ineffective assistance." This was error. Under *Strickland,* "[u]nless a defendant makes *both* showings"—deficient performance and prejudice—"it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052 (emphasis added). We do find it unnecessary, however, to re-

mand for a determination of that issue by the judge. Trial counsel's reasons for not moving to suppress the statement are set forth in the record of the hearing, *see* Br. for United States at 44 ("[T]he record on the issue is complete."), and we owe no deference to the trial court's legal conclusion as to whether counsel was deficient. *See Byrd v. United States,* 614 A.2d 25, 30 (D.C.1992). We accordingly proceed to consideration of the issue.

11. Counsel had known that the government planned to present testimony of two accom-

er, he admitted that the statement portrayed Little at least in the role of an active aider and abettor who had joined the "plan" to confront Perry and who, at the scene, had pulled out his own gun to "stand watch" and make sure no one else "tried to get into it" while the shooting took place. Tellingly, counsel had soon recognized the thinness of this distinction between principal and accomplice liability as a basis for disputing Little's guilt, because at trial, after a detective described the circumstances of the questioning, counsel moved orally to suppress the written statement, declaring that it "appears to have been the product of custodial interrogation and Mr. Little was not advised that he was free to go." Unsurprisingly, this was met by a ruling that his motion to suppress came too late. He then engaged in what amounted to damage control by trying to discredit the statement in closing argument, conduct quite inconsistent with a reasonable belief that it strengthened the defense of innocent presence.

The "principal reason," counsel admitted at the hearing, why he had not moved to suppress the statement was not a tactical one but simply that the motion appeared to lack merit: from what he knew, Little "didn't appear to be in custody at the time and he didn't complain [to counsel] of [any] issue relating to voluntariness." As we have seen, however, a claim that Little had been in custody at the time plainly was not meritless, a fact counsel recognized at trial when he argued to the court—too late— that even though Little had not been "placed under arrest, . . . he was brought

down [to the homicide office] after the execution of a search warrant and never told . . . he was free to go" during the "custodial interrogation." What this tells us, at bottom, is that counsel made no serious inquiry before trial into the twin issues of custody and advice of *Miranda* rights. Rather, what seems to have been relevant to him at that time (he had retained no notes of his case preparation) were the facts merely (a) that Little had not been formally arrested at the time he made the written statement,[12] and (b) that nothing he had told counsel suggested "any voluntariness problems [as a basis] for suppressing statements," meaning that "Mr. Little didn't tell me that he was beaten, or roughed up, or intimidated, or coerced into making a statement." In practical effect, the issue of custody was no different for counsel than whether Little's statement had been coerced, and he expressly admitted that the issue of whether Little had been advised of his *Miranda* rights "was not something that [he] focused on at the time." Altogether, counsel's failure "to make reasonable investigation[ ]," *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052, into a claim that Little's statement was the product of unwarned custodial interrogation shows that his conduct was deficient under the first part of *Strickland's* test. *See Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

**B.**

■ To demonstrate prejudice under *Strickland*, "[t]he defendant must show

---

plices identifying Little as one of the shooters, and absent an available alibi defense, he had concluded he could not plausibly dispute Little's presence at the scene.

**12.** In an apparent explanation to the trial judge why he had not sought pretrial suppression, counsel stated that "it appears from everything on paper that Mr. Little . . . was

not under arrest at the time the [written] statement was made. The statement was made . . . months before his actual arrest in this case." These observations were made before counsel heard the detective's testimony describing the circumstances of the interrogation.

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case," *id.* at 693, 104 S.Ct. 2052; rather, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

In finding the required "reasonable probability that the trial's outcome would have been different had [the suppression] motion been timely filed," the motions judge explained:

> Only two witnesses testified at trial who could identify [Little] as being present when Mr. Perry was killed, Donnell Campbell and Dion Batts. Mr. Campbell identified [Little], indicated that prior to the shooting [Little] said "pop him," and stated that [Little] possessed a gun and fired several shots at Mr. Perry. In exchange for his testimony, Mr. Campbell was promised immunity from prosecution both as an adult and as a juvenile. Dion Batts testified [that Little] was present on the night in question and had a gun, but that he did not see [Little] fire shots or hear him say "pop him." Mr. Batts instead testified that he [Batts] turned and ran prior to any shots being fired. Mr. Batts was impeached with inconsistent testimony given before the Grand Jury, but none of that testimony was received as substantive evidence. Thus the jury's view of Mr. Campbell's credibility was quite possibly affected by the immunity agreement, and its view of Mr. Batts's testimony could easily have been minimal. The actual murder weapon was not introduced at trial. Given problematic ev-

idence connecting [Little] to Mr. Perry's murder, there is a reasonable probability that [Little's] June 2, 1989 statement, directly connecting him with the murder of Donnell Perry, provided a key piece of evidence on which the jury relied in finding [Little] guilty.

We agree with this assessment. Although the government points out "that Batts' testimony dovetailed with Campbell's testimony in most respects" (Br. for United States at 40), there were differences, and the fact remains that both men, as possible accomplices in carrying out the "plan," had incentives to shape their testimony to the government's liking—or so a jury could reasonably believe. The significance of Little's incriminatory statement as bolstering these witnesses' testimony was not lost on the prosecutor in summation, where he stated:

> Robert Little wanted to be in on the thing about getting revenge. And even if you don't believe through Donnell Campbell that [Little] was there, we want you to look at something else. Government's Exhibit No. 2A, a statement from Mr. Robert Little, even before he was arrested. He said there was a plan. He said Donnell Campbell was there in on the plan. He said Christopher Williams was there in on the plan. He said we armed ourselves with guns to confront Donnell Perry. Oh, there was a plan. There's no doubt about that.

As further indication that Little's written statement was of no small account, the government argues that, had it been suppressed, the prosecutor would have taken timely steps to introduce a videotape of a second statement that Little had made to the police months later when he was formally arrested,[13] in which—according to

---

**13.** The prosecutor announced his intent to    introduce the videotaped statement, but did

the government's brief—Little repeated his admissions after being advised of and waiving his rights. If for no other reason, this argument fails because the videotape was not made part of the record of the § 23–110 hearing, and the motions judge thus had no opportunity to consider its contents on the issue of prejudice. On appeal as well, we are left to speculate about its contents except that the government concedes a material difference by telling us that, unlike in the written statement, Little denied in it ever having possessed a gun at the scene. We cannot speculate about the effect that a statement not introduced at trial and the contents of which are unknown to us even now may have had in offsetting prejudice from trial counsel's failure to seek suppression of Little's damaging written admissions.

The order granting the post-conviction motion is

*Affirmed.*

▬

not do so after he encountered problems in redacting extraneous material from it and the court refused a request for additional time to complete the redaction.